Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| FRANCISCO J. MELÉNDEZ<br><br>Recurrido<br><br>v.<br><br>ROBERTO MELÉNDEZ H/N/C TRANSMISIONES AUTO<br><br>Recurrente | TA2025RA00279 | *Revisión* procedente del Departamento de Asuntos del Consumidor<br><br>Querella Núm.: SAN-2023-0017603<br><br>Sobre: Talleres de mecánica de automóviles |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Bonilla Ortiz y la Jueza Martínez Cordero.

*Martínez Cordero, jueza ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de noviembre de 2025.

Comparece Roberto Meléndez h/n/c Transmisiones Auto (en adelante, parte recurrente) mediante un recurso de *Revisión Judicial* para, solicitarnos la revisión de la *Resolución* emitida el 31 de julio de 2025, y notificada el 7 de agosto de 2025, por el Departamento de Asuntos del Consumidor (en adelante, DACo).[1] Mediante la *Resolución* recurrida, el DACo declaró *Ha Lugar* la querella incoada y ordenó a la parte recurrente a pagar la suma de $2,565.48 dólares al recurrido del título.

Por los fundamentos que expondremos, se *confirma* la *Resolución* recurrida.

I

El caso de marras inició cuando, el 4 de diciembre de 2023, el señor Francisco J. Meléndez (en adelante, recurrido) interpuso una *Querella* contra la parte recurrente ante el DACo.[2] Alegó que, a principios de octubre de 2023, su vehículo de motor, marca Toyota

---

[1] Sistema Unificado de Manejo y Administración de Casos del Tribunal de Apelaciones (SUMAC TA), a la Entrada Núm. 1, Apéndice 2.
[2] *Íd.*, a la Entrada Núm. 1, Apéndice 4, págs. 6-14.

Land Cruiser, comenzó a tener problemas en la transmisión, por lo que lo llevó al taller de la parte recurrente. Sostuvo que acordaron que la reparación iba a tener un costo de $2,620.00 dólares. No obstante, señaló que, cuando fue a llevarle el depósito de $1,500.00 dólares para unos materiales, le indicó que la reparación se había cotizado por un precio muy bajo, por lo cual le debía cobrar unos $200.00 dólares adicionales. Adujo que luego, el 15 de noviembre de 2023, la parte recurrente le informó que el vehículo no prendió debido a que el motor estuvo apagado por mucho tiempo. A esos efectos, se le informó que el costo de la reparación iba a ser de $5,200.00 dólares, los cuales se negó a pagar. Explicó que le pagó a la parte recurrente la cantidad de mil quinientos $1,500.00 dólares, más los doscientos $200.00 dólares adicionales. Sin embargo, sostuvo que se negó a pagar la diferencia hasta llevar el vehículo a otro mecánico para que, cuando prendiera, pudiera verificar si el trabajo del recurrente estaba bien hecho. Por otra parte, planteó que, antes de llevar su vehículo de motor al taller, el mismo no tenía otros fallos además de la transmisión. A tenor, solicitó que se arreglara el vehículo de motor sin costo alguno, toda vez que los daños al mismo no ocurrieron bajo su custodia.

Varios meses más tarde, el 13 de enero de 2024, la parte recurrente instó su contestación a la *Querella*.[3] En esencia, negó las alegaciones presentadas en la referida querella y esbozó defensas afirmativas. Particularmente, en sus defensas afirmativas, arguyó que:

> De haber algún daño, el mismo es producto de actos propios o condiciones no relacionadas con la reparación llevada a cabo por el querellado.[4]

---

[3] SUMAC TA, a la Entrada Núm. 1, Apéndice 13.
[4] *Íd.*, pág. 47.

Luego, el 12 de febrero de 2024, el DACo emitió una *Notificación de citación de inspección*.[5] Dispuso que la inspección se llevaría a cabo el 5 de marzo de 2024.

De ahí, realizada la inspección, el 5 de marzo de 2024, se emitió el *Informe de Inspección Vehículos de Motor,* el cual fue notificado el 11 del mismo mes y año.[6] Como parte de los hallazgos en la inspección, se informó que se entrevistó a la parte recurrente, quien señaló que al vehículo se le trabajó la transmisión automática y que, posteriormente, el motor no prendió. De igual forma, surge que, en presencia del inspector, se intentó prender el motor, pero no inició la marcha. Además, se desprende de la opinión pericial, que el vehículo requería un diagnóstico general con un electromecánico y que se sugirió la celebración de una vista administrativa.

Así las cosas, el 9 de abril de 2024, el DACo emitió *Notificación de enmienda.*[7] Lo anterior, tras haberse recibido una enmienda a la querella instada por el recurrido.[8] En la misma, el recurrido señaló que mientras su vehículo se encontraba en las facilidades de la parte recurrente la batería fue removida y se encontraba fuera de lugar. Asimismo, adujo que la parte recurrente le había informado que no encontraba código alguno para descifrar la causa por la cual el vehículo no prendía. Por otra parte, indicó que consultó a un mecánico llamado Bernie, quien le informó que el vehículo no prendió debido a que el motor se encontraba fuera de tiempo. En mérito de lo expuesto, peticionó al DACo que se le devolviera el vehículo en las condiciones en las que se encontraba antes de llevarlo al taller de la parte recurrente.

Posteriormente, la vista administrativa fue celebrada los días 19 de julio y 30 de octubre de 2024 y 9 de abril de 2025.

---

[5] SUMAC TA, a la Entrada Núm. 1, Apéndice 5.
[6] *Íd.,* Apéndice 6.
[7] *Íd.,* Apéndice 8, págs. 28-30.
[8] *Íd.,* págs. 31-32.

De la *primera* vista, celebrada el 19 de julio de 2024,[9] se desprende que el DACo ordenó a las partes a dialogar y procurar una opinión de un perito electromecánico independiente, a ser costeado por ambas partes, para que rindiese un informe del vehículo. A tenor, el 3 de septiembre de 2024, notificada al día siguiente, se emitió una *Orden* mediante la cual se le requirió a las partes coordinar la cuestión del electromecánico.[10]

Posteriormente, el 14 de septiembre de 2024, el recurrido envió un *Correo electrónico* al DACo en el cual expuso que recibió la notificación de la orden el 14 de septiembre de 2024.[11] Asimismo, alegó que, según lo instruido en la vista celebrada el 19 de julio de 2024, ese mismo día, se comunicó con el señor Juan Román (señor Román) del taller Toyo Specialist para informarle que le iba a llevar su vehículo para una evaluación y estimado de reparación. Expresó que, el 29 de julio de 2024, llevó su vehículo a Toyo Specialist y que, desde ese día, se comunicaba con el señor Román, semanalmente, para darle seguimiento a lo encargado. Sin embargo, adujo que la respuesta del señor Román era que tenía que esperar debido al alto volumen de vehículos que tenía para reparar. Sostuvo que, el 12 de septiembre de 2024, le mencionó al señor Román que, ante la dilación para proveerle un diagnóstico y un estimado del vehículo, se veía en la obligación de llevarse el mismo del taller. Por otra parte, indicó que se encontraba en comunicación con el taller Electro Cool, el cual le habían recomendado muy favorablemente y le indicó que podían recibir el vehículo, tan pronto como el 19 de septiembre del año en curso. De manera que, cuando el referido taller le proveyera información con relación al vehículo, así como sobre los costos de

---

[9] SUMAC TA, a la Entrada Núm. 1, Apéndice 2.
[10] *Íd.*, Apéndice 9 y 10. Conviene mencionar que, surge de los autos que la notificación fue enviada a las partes el 4 de septiembre de 2024. No obstante, las partes recibieron la notificación el 14 de septiembre de 2024.
[11] SUMAC TA, a la Entrada Núm. 5, Anejo 7, págs. 62-63.

reparación, le estaría informando tanto al DACo como a la parte recurrente.

Posteriormente, en la *segunda* vista, celebrada el 30 de octubre de 2024,[12] el recurrido informó que, ante la falta de atención del primer taller, tuvo que remover la unidad y llevarla al taller Electro Cool, pero que aún no habían realizado las pruebas de rigor. Además, informó que tenía la necesidad de recuperar su vehículo, por lo que solicitó autorización para proceder con las reparaciones.

Luego de varios tramites procesales innecesarios pormenorizar, la *tercera* y última vista fue celebrada el 9 de abril de 2025, allí las partes presentaron sus argumentos en derecho. Ahora bien, la única prueba directa fue la presentada por el recurrido. Esta, consistió en el testimonio del propio recurrido y el testimonio de la parte recurrente, como testigo hostil. Además, fueron admitidos siete (7) documentos en evidencia.[13] Por otro lado, se desprende de los autos que el recurrido ofreció como prueba el Anejo D-1 de la Querella Enmendada.[14]

Celebrada la vista administrativa, pero antes de emitida la resolución objeto de este recurso, se suscitaron ciertos incidentes procesales los cuales precisa mencionar. Veamos.

El primero fue que, el 2 de junio de 2025, la parte recurrente interpuso una *Moción de Non-Suit al amparo de la Regla 39.2*.[15] Alegó que el recurrido no probó las alegaciones de su caso con evidencia

---

[12] SUMAC TA, a la Entrada Núm. 5, Anejo 7, págs. 64-67. Véase, además, Entrada Núm. 5, Anejo 8, págs. 68-71.

[13] SUMAC TA, a la Entrada Núm. 1, Apéndice 2, págs. 89-90. Surge de los autos que la prueba admitida fue la siguiente: Exhibit 1: Recibo de depósito de $1,500.00 dólares con fecha del 10 de noviembre de 2023; Exhibit 2: Captura de pantalla de conversación de Whats[A]pp entre la parte recurrente y el recurrido del 28 de noviembre de 2025; Exhibit 3: Captura de pantalla de conversación de Whats[A]pp entre recurrido y Bernie (mecánico referido por la parte recurrente) del 1 de diciembre de 2023; Exhibit 4: Recibo de Yonti Towing del 19 de septiembre de 2024 por $140.00 dólares; Exhibit 5: Recibo de Toyomax del 15 de enero de 2025 por $490.60 dólares; Exhibit 6: Recibo de Electro Cool del 29 de enero de 2025 por $2,989.59 dólares y recibo de pago de tarjeta de crédito por $2,989.59 dólares; Exhibit 7: Recibo Advance Auto Parts del 30 de julio de 2024 por $245.29 dólares.

[14] SUMAC TA, a la Entrada Núm. 1, Apéndice 2, pág. 90. Conviene mencionar que el recurrido ofreció como prueba el Anejo D-1 de la Querella Enmendada.

[15] SUMAC TA, a la Entrada Núm. 1, Apéndice 14.

sustancial. Asimismo, sostuvo que el recurrido no presentó prueba que estableciera la relación causal entre la reparación de la transmisión del vehículo y el fallo del motor. Además, indicó que la *Querella* debía ser desestimada ya que el recurrido no debía ser considerado como un consumidor, toda vez que incumplió con el pago del balance restante de la reparación. Por otra parte, adujo que el recurrido incumplió con una orden del juez administrativo, la cual le requería a ambas partes coordinar para llevar el vehículo a un electromecánico para una inspección. Explicó que el recurrido retiró el vehículo del mecánico, al cual ambas partes habían previamente acordado, y lo llevó al taller Electro Cool, sin informar. Adujo que, lo anterior, constituyó expoliación de la prueba y una violación a su debido proceso de ley. A tenor, solicitó el cierre y archivo del caso ante la falta de prueba que permitiera a la agencia tomar una determinación con evidencia sustancial.

Por otro lado, el 25 de junio de 2025, el recurrido instó una *Oposición a "Moción de Non-Suit al amparo de la Regla 39.2".*[16] Esbozó que era incorrecta la afirmación de la parte recurrente sobre que no se presentó prueba relacionada a la causalidad entre la intervención de esta y el desperfecto del motor. Sostuvo que, tanto los testimonios ofrecidos como los documentos admitidos, constituían prueba circunstancial que demostraron que el daño surgió, inmediatamente, luego de reinstalada la transmisión. Indicó que los daños sufridos como consecuencia directa del incumplimiento de la parte recurrente fueron concretos, cuantificables, y razonablemente incurridos para restaurar la funcionalidad del vehículo. Por otro lado, expresó que carecía de méritos la alegación de la parte recurrente, en cuanto a falta de legitimación como consumidor por haber dejado un balance del pago

---

[16] SUMAC TA, a la Entrada Núm. 1, Apéndice 15.

pendiente. Esbozó que, lo anterior, era improcedente, ya que las partes no podían exigir sus contraprestaciones, sin antes haber cumplido con su propia obligación. Asimismo, adujo que era falsa la alegación sobre expoliación de la prueba, debido a que se le informó oportunamente al juez administrativo sobre la inacción del primer taller asignado y la intención de trasladar la unidad a otro establecimiento, para llevar a cabo la evaluación ordenada. A tenor, solicitó que declarara *Ha Lugar* la *Querella,* se denegara la solicitud de *non-suit* presentada por la parte recurrente, y se dictara resolución final para condenar a esta a reembolsar la cantidad de $3,865.48 dólares, por concepto de la totalidad de los gastos incurridos como consecuencia directa de su incumplimiento.

Específicamente, indicó que los gastos incurridos fueron: (i) $245.29 dólares por el costo de una batería nueva; (ii) $140.00 dólares por gastos de transporte al taller Electro Cool, en el cual se confirmó que el motor se había salido de tiempo y se realizaron al vehículo trabajos de reparación necesarios para corregir el defecto; (iii) $490.60 dólares por el costo de piezas necesarias para la reparación; y (iv) $2,989.59 dólares por el costo de reparación realizada por el taller Electro Cool. Por otra parte, solicitó la indemnización $1,500.00, por concepto de angustias mentales.

Con todo lo anterior, el 31 de julio de 2025, notificada el 7 de agosto del mismo año, el DACo emitió la *Resolución* objeto de revisión.[17] Mediante la *Resolución* recurrida, el DACo declaró *Ha Lugar* la querella incoada y ordenó a la parte recurrente a pagar la suma de $2,565.48 dólares al recurrido del título, para lo cual concedió el término de veinte (20) días.

Como parte del dictamen, el DACo emitió las siguientes sesenta (60) determinaciones de hechos:

---

[17] SUMAC TA, a la Entrada Núm. 1, Apéndice 2.

1. El querellante es el Sr. Francisco José Meléndez Barrera ("Querellante"), quien se dedica a la gerencia de proyectos.

2. El Querellante es dueño de una Toyota, Land Cruiser de 2011 (la "Unidad" o "Vehículo"). La Unidad tenía 127,062 millas al momento de ser llevada al taller del querellado.

3. El querellado es el Sr. Roberto Meléndez Torres (el "Querellado"), dueño de un taller de mecánica especializado en transmisiones de vehículos de motor en general.

4. El Querellado posee 32 años de experiencia trabajando en la reparación y reconstrucción de transmisiones automáticas.

   El querellante sintió que su guagua estaba "patinando" cuando ponía la marcha en reversa en octubre de 2023.

5. Contactó al Querellado y coordinaron una cita para que éste examinara su guagua.

6. El querellante manej[ó] su auto a la cita con el querellado para que este la examinara y [é]l le diagnosticó que los sellos estaban gastados por lo que procedía su reemplazo.

7. La Unidad no daba ningún indicio de que tenía otro fallo ni el querellado diagnostic[ó] otra cosa.

8. Se coordin[ó] entre ellos entregar la unidad el 31 de octubre de 2023 en el taller para efectuar reparación porque el Querellante se iba de viaje.

9. El Querellado indicó que no estaría en el taller durante la mañana, pero que podía dejar el Vehículo frente al taller.

10. Temprano en la mañana del 31 de octubre de 2023, el Querellante estacionó la Unidad frente a los portones del taller del Querellado, colocó la llave en una bolsa "Ziplock" y, a través de las rejas del portón, tiró las llaves dentro de la caja de una pick-up que estaba estacionada dentro del taller.

11. El Querellado fue quien prendió la Unidad para estacionarla dentro del taller.

12. Al trabajo a realizar de reparación de la transmisión, incluyendo el remplazo de los sellos[,] se le estim[ó] un costo de $2,600.00.

13. El Querellante regresó el 7 de noviembre a Puerto Rico y el jueves 9 de noviembre volvió hablar con el Querellado quien le indicó que necesitaba un depósito para comprar las piezas.

14. El 10 de noviembre de 2023, el Querellante le entregó $1,500.00 al Querellado por concepto de depósito pagado en efectivo a solicitud del querellado[.]

15. El día en que el Querellante le entregó el depósito, el Querellado le aumentó el estimado de la reparación por $200.00 para un total de $2,800.00.

16. El Querellado indic[ó] que realizó el trabajo de desmontar e inspeccionar la transmisión de la Unidad, reemplazar los sellos, los discos (clutches) y otros componentes internos[,] como parte de un kit de reparación. También instaló un "shift kit" para mejorar la fluidez de los cambios y realizó modificaciones al cuerpo de válvulas.

17. El querellado le indic[ó] que luego de completar la reparación se reinstaló la transmisión en la Unidad realizando el proceso de montaje y conexión correspondiente, incluyendo la fijación del puente de transmisión, el convertidor, y los componentes auxiliares.

18. Indic[ó] el querellado que al reinstalar la transmisión en la Unidad no trabajó con el retenedor de cigüeñal trasero "porque no estaba liqueando".

19. El Querellado no mantuvo ningún récord escrito, checklist o bitácora detallando los pasos específicos del trabajo realizado en la Unidad.

20. Una vez reinstalada la transmisión, el Querellado intentó encender la Unidad sin éxito. La guagua no encendía, por lo que no pudo completarse el procedimiento de rellenado de aceite.

21. El Querellado fue la única persona que trabajó la Unidad.

22. El Querellado llamó al Querellante para preguntarle si su Vehículo tenía un "corta corriente".

23. El Querellado le indicó al Querellante - al momento de preguntarle sobre el "cortacorriente" - que el vehículo no prendía, que trataba de prenderlo, "estarteaba" pero no prendía.

24. El Querellado testificó que, ante la imposibilidad de encender la Unidad luego de reinstalar la transmisión, consideró como posible causa la desprogramación de llave. Él intentó verificar si la llave tenía señal, pero no logró hacerlo con su escáner, por lo que permitió que un tercero, especializado en programación de llaves, interviniera con la Unidad sin haber solicitado ni obtenido autorización previa del Querellante. Finalmente, reconoció que se detectó señal en la llave que dicha causa fue descartada como origen del desperfecto.

25. Ante la imposibilidad de encender la Unidad, el Querellado consultó con un mecánico externo especializado en vehículos Toyota, así como con un técnico de llaves, sin haber obtenido autorización previa del Querellante para que terceros intervinieran con su vehículo.

26. Dos o tres días después de esta conversación el Querellante visitó el taller, porque tenía que recoger unas cosas del Vehículo y para ver qu[é] estaba pasando con la Unidad.

27. Allí, había otro mecánico que el Querellante no conocía, revisando su vehículo y tratando de prenderlo en tres ocasiones frente al Querellante. La Unidad no encendía, y

cuando intentaban prenderlo, "estarteaba" y tiraba una contra explosión.

28. El Querellante no había autorizado a que otra persona trabajase su Vehículo, pero ya había sucedido.

29. El 28 de noviembre de 2023, en comunicaciones por la plataforma WhatsApp, el Querellado le informó que vino otro mecánico y no encontraron nada, que todos los días trataba de prenderla y que necesitaba sacarla para hacer espacio en su taller.

30. El Querellante le preguntó si el vehículo daba códigos. El Querellado le respondió que: "nop! increíble ".

31. Unos días más tarde, el Querellado le dejó saber al Querellante que otro mecánico de nombre Berni le iba a llamar para dejarle saber lo que tenía la Unidad.

32. El 1 de diciembre de 2023, el Querellante recibió una comunicación por WhatsApp del número de teléfono (787) 530-2423, identificándose como Garage Bernie[,] quien se especializaba en Toyota. Dijo que "la guagua lo que le pas[ó] tuvo una descarga de los tensores de cadena de tiempo y al tratar de prender la guagua se fue de tiempo".

33. El Querellante le preguntó cómo sucede eso. Bernie le respondió que eso pasa cuando el motor está mucho tiempo apagado sin encender.

34. Antes de traerse la Unidad al taller del Querellado el 31 de octubre de 2023, el periodo de tiempo que no se había prendido o usado la Unidad había sido una semana, lo que no constituye mucho tiempo apagado.

35. El querellante solicit[ó] sacar su auto del taller del querellado para buscar otra opinión.

36. El Querellado le dijo que no podía llevarse la Unidad porque le debía los $1,300.00 de la reparación de la transmisión.

37. Ante la indolencia del querellado[,] el Querellante presentó la Querella de epígrafe el 4 de diciembre de 2023.

38. El 5 de marzo de 2024, el Técnico de Investigación de DACO[,] Sr. José Torrón Martínez, inspeccionó el Vehículo en el taller del Querellado.

39. Al momento de hacer la inspección, la batería de la Unidad no estaba instalada[,] pues fue removida del vehículo sin el consentimiento del Querellante y esta desapareció estando bajo la custodia del querellado.

40. Luego de tratar con tres baterías distintas de otros vehículos se encontró una compatible con la guagua y se hizo la inspección.

41. El señor Torrón Martínez rindió el Informe de Inspección de Vehículo de Motor (el "Informe"), que fue notificado el 11 de marzo de 2025.

42. El Informe recoge el siguiente hallazgo, transcrito literalmente:

El vehículo estaba en poder del querellado. Lo entrevisté y me dej[ó] saber que el vehículo entr[ó] corriendo[,] se le trabaj[ó] la transmisión automática y ahora no quiere prender el motor. En presencia mía intentaron prender el motor, pero solo aplica el motor de arranque y el de combustión interna no inicia la marcha[,] o sea[,] no prende el motor. Solicit[é] hacer una evaluación (D.T. C. Diagnostic Trouble Code) y mostr[ó] los siguientes códigos[:]

a. Engine - Current Codes 3

   i. PO353 - Ignition Coll "C" Primary / Secondary Circuit
   ii. PO357 - Ignition Coll "G" Primary / Secondary Circuit
   iii. PO358 - Ignition Coll "H" Primary / Secondary Circuit

b. Transmission - Current Code 3

   i. PO353 - Ignition Coll "C" Primary / Secondary Circuit
   ii. PO357 - Ignition Coll "G" Primary / Secondary Circuit
   iii. PO358 - Ignition Coll "H" Primary / Secondary Circuit

c. Antilock Brakes - Current Codes 2

   i. C1201- Engine / EV Control System Fault
   ii. C1336- Zero Point Calibration Yaw Rates Sensor Undone

d. Engine

   i. B1424 - Solar Sensor Circuit (Driver Side)
   ii. B1449- Air outlet damper control servomotor Circuit (Rear)

e. Heating & Air Conditioning-HVAC History Codes – Code 1

f. B1449 Air outlet damper control servomotor Circuit (Rear)

La opinión del Inspector es que el vehículo requiere un diagnóstico general con un electromecánico.

43. El Querellante entendió necesario enmendar la Querella porque en la inspección surgieron todos esos códigos, lo que resultó contrario a lo dicho por el Querellado previamente de que no había códigos.

44. Las partes acordaron en la vista del 19 de julio de 2024[,] llevar el vehículo al taller del Sr. Juan Román, electromecánico que tanto el Querellante como el Querellado conocían.

45. Entre el 26 o el 27 de julio, el vehículo fue llevado al taller del señor Román[.] Se utilizó el gruero del Querellado para llevar la Unidad al taller del señor Román.

46. Este le indicó al Querellante que la batería de la Unidad no era la indicada y tampoco servía, y que para poder trabajar la Unidad necesitaba que le trajera una batería nueva.

47. El 30 de julio de 2025, el Querellante fue a Advance Auto Parts y compró la batería a un costo de $245.29.

48. El Querellante llamaba semanalmente al señor Román para indagar sobre el estatus de los trabajos para con la Unidad, recibiendo la misma respuesta de que tenían el taller lleno y no podría atender el Vehículo del Querellante.

49. Dos meses después, a raíz de la Orden de este Foro del 3 de septiembre de 2024[,] dirigida al Querellante para que informe el resultado de las gestiones con el electromecánico, el Querellante llamó al señor Román e indicó que se llevaría el vehículo a otro taller[,] pues él nunca lo trabajó.

50. El 14 de septiembre de 2024, el Querellante envió un correo electrónico a este Juez Administrativo para cumplir con la Orden e informar las gestiones realizadas. El correo electrónico fue presentado en los autos de esta Querella el 16 de septiembre de 2024.

51. El 19 de septiembre de 2024, el Querellante se llevó su Vehículo al taller Electro Cool, operado por el Sr. Vicente Quintana.

52. Para transportar su Vehículo, el Querellante utilizó los servicios de Yonti Towing, costándole el acarreo $140.00, pagados por el Querellante.

53. El Vehículo también estuvo varios meses sin ser atendido en el taller Electro Cool.

54. Ante la insistencia del querellante[,] Electro Cool emitió un estimado para arreglar la Unidad el 28 de octubre de 2024.

55. En la Vista Administrativa del 30 de octubre de 2024, luego de haber informado que la Unidad fue llevada a otro taller, el Querellante solicitó autorización para reparar su vehículo por necesidad de usarlo.

56. El Querellante le ofreció al taller Electro Cool comprar las piezas que necesitaran para reparar el vehículo y traérselas con la intención de agilizar el trabajo. Lo hizo el 15 de enero de 2025, el Querellante fue y adquirió todas las piezas necesarias para reparar el Vehículo.

57. En el taller Electro Cool, realizaron los siguientes trabajos para reparar la Unidad;
    a. Compraron el Kit de la Junta de Cover de Válvulas
    b. Remplazo con Bugías Nuevas
    C. Rectificaron la tapa de bloque del motor
    d. Arreglaron la junta de bloque derecha
    e. Labor de remover tapa de bloque y montura de tiempo
    f. **Remover la transmisión y poner placa de crank sensor en su lugar**[18]

---

[18] Énfasis en el Original.

58. El 29 de enero de 2025[,] el Querellante recogió su guagua del taller Electro Cool y pagó la cantidad de $2,989.59.

59. Luego de pagar la factura de Electro Cool, el Querellante se llevó su vehículo que está funcionando "correctamente".

60. El Querellante solicita la cantidad de $2,565.48 en daños, equivalente a los gastos incurridos por el Querellante para reparar la Unidad, menos los $1,300.00 que aún no le ha pagado al querellado por el trabajo de reparación de la transmisión.[19]

Por otro lado, en la *Resolución* recurrida, el DACo concluyó que el recurrido probó que su vehículo sufrió daños provocados por la parte recurrente mientras su unidad estaba bajo el control de éste y que incurrió en gastos razonables y necesarios para corregir el desperfecto. Concluyó, además, que los gastos incurridos fueron como consecuencia directa del incumplimiento contractual y del manejo deficiente de la reparación originalmente contratada. Explicó que los daños incurridos por el recurrido ascendían a $3,865.48 dólares, empero, cónsono al reconocimiento de este, se le descontaría la suma de mil trescientos dólares $1,300.00 dólares correspondiente al balance que permanecía pendiente del trabajo de reparación de la transmisión.

Insatisfecho, el 27 de agosto de 2025, el recurrente interpuso una *Moción de reconsideración*.[20] En reacción, el 25 de septiembre de 2025, el recurrido instó su *Oposición a moción de reconsideración*.[21] Ahora bien, no se desprende del caso de título que dicha solicitud de reconsideración fue atendida por el DACo.

De ahí, el 9 de octubre de 2025, la parte recurrente interpuso un recurso de revisión en el cual esbozó la comisión de los siguientes cinco (5) errores:

    A. FALTA DE LEGITIMACIÓN DEL QUERELLANTE[.]
    B. IMPROCEDENCIA DE LA CUANTÍA[.]
    C. SPOLIATION OF EVIDENCE[.]
    D. INCUMPLIMIENTO CON PRESENTAR PRUEBA SUSTANCIAL[.]

---

[19] SUMAC TA, a la Entrada Núm. 1, Apéndice 2 y 16, págs. 90-96.
[20] *Íd.*, Apéndice 17.
[21] *Íd.*, Apéndice 19.

E. DETERMINACIONES DE HECHOS CONTRARIAS A LA PRUEBA DESFILADA[.]

El 24 de octubre de 2025, compareció el DACo para presentar copia certificada del expediente administrativo. Luego, el 17 de noviembre de 2025, compareció la parte recurrida mediante *Alegato en oposición a revisión administrativa.* Con el beneficio de la comparecencia de las partes, procederemos a disponer del recurso instado.

II

**A. La Revisión Judicial**

El Tribunal Supremo de Puerto Rico ha sostenido que el derecho a cuestionar la determinación de una agencia, mediante revisión judicial, es parte del debido proceso de ley protegido por la Constitución de Puerto Rico.[22] Como corolario de lo anterior, el Artículo 4.006 (c) de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico[23] otorga competencia apelativa al Tribunal de Apelaciones para revisar las decisiones, órdenes y resoluciones finales de las agencias administrativas.[24] Esta revisión tiene como finalidad delimitar la discreción de los organismos administrativos para asegurar que ejerzan sus funciones conforme a la ley y de forma razonable.[25] Asimismo, corresponde a los tribunales examinar si las decisiones de las agencias administrativas fueron tomadas dentro de los poderes delegados y si son compatibles con la política pública que las origina.[26] A tales efectos, la revisión judicial comprende tres (3) aspectos: (i) la concesión del remedio apropiado; (ii) la revisión de las determinaciones de hecho conforme al criterio de evidencia

---

[22] *Asoc. Condómines v. Meadow Dev.,* 190DPR 843, 847 (2014); *Picorelli López v. Depto. de Hacienda,* 179 DPR 720, 736 (2010).
[23] Ley Núm. 201-2003, 4 LPRA sec. 24y(c).
[24] *Asoc. Condómines v. Meadows Dev.,* supra, a la pág. 847.
[25] *Empresas Ferrer v. ARPe,* 172 DPR 254, 264 (2007).
[26] *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 35 (2018).

sustancial, y (iii) la revisión completa y absoluta de las conclusiones de derecho.[27]

Es norma sabida que los tribunales apelativos, al ejercer su función revisora, deben conceder una gran deferencia a las decisiones emitidas por las agencias, debido a la vasta experiencia y conocimiento especializado en los asuntos que les han sido encomendados.[28] Ahora bien, aunque los tribunales están llamados a conceder cierta deferencia a las decisiones administrativas, tal norma no es absoluta. Ello, puesto a que no puede imprimírsele un sello de corrección automático, bajo el pretexto de deferencia, a determinaciones o interpretaciones administrativas que son irrazonables, ilegales o contrarias a derecho.[29]

### B. La Revisión de Determinaciones de Hechos y Conclusiones de Derecho en las Resoluciones Administrativas

Sabido es que la revisión judicial de las adjudicaciones administrativas va tanto sobre la esfera de los hechos como la del derecho.[30] A esos efectos, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAUG) dispone que "[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo".[31] Mientras que "[l]as conclusiones de derecho serán revisables en todos sus aspectos por el tribunal.[32] Respecto a la evidencia sustancial esta se ha definido como "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener

---

[27] *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 217 (2012), citando a *Asoc. Fcias. V. Caribe Specailty et al. II,* 179 DPR 923, 940 (2010); *Mun. de San Juan v. JCA*, 149 DPR 263, 279-280 (1999).
[28] *Rolón Martínez v. Supte. Policía,* supra, a la pág. 35.
[29] *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, 213 DPR 743 (2024).
[30] *W.M.M., P.F.M. et al. v. Colegio et al.*, 211 DPR 871, 904 (2023).
[31] Ley 38-2017, 3 LPRA sec. 9675.
[32] *Íd.*

una conclusión".[33]  Para determinar lo anterior, será necesario que la evidencia sea considerada en su totalidad, es decir, tanto aquella que sostenga la decisión administrativa como la que menoscabe el peso que la agencia le haya conferido.[34] Precisa resaltar que la norma de prueba sustancial se sostiene en la premisa de que son las agencias las que producen y determinan los hechos en los procesos administrativos, y no los tribunales.[35] Es por eso, que, de existir un conflicto razonable en la prueba, debe respetarse la apreciación de la agencia.[36]

Por otra parte, debido a la presunción de regularidad y corrección de las decisiones de las agencias administrativas, quien alegue ausencia de evidencia sustancial tendrá que presentar prueba suficiente para derrotar esta presunción, no pudiendo descansar en meras alegaciones.[37] Para ello, deberá demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración.[38] Si la parte afectada no demuestra la existencia de otra prueba que muestre que la actuación de la agencia no está basada en evidencia sustancial o que reduzca o menoscabe el valor de la evidencia impugnada, el Tribunal respetará las determinaciones de hecho, y no sustituirá el criterio de la agencia por el suyo.[39]

---

[33] *Batista, Nobbe v. Jta. Directores*, supra, a la pág. 216; *Otero v. Toyota*, supra, a la pág. 728.
[34] *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.*, 144 DPR 425, 437 (1997).
[35] Fernández Quiñones, *Derecho administrativo y Ley de Procedimiento Administrativo Uniforme*, 3ra ed., Colombia, Ed. Forum, 2013.
[36] *Hilton v. Junta de Salario Mínimo*, 74 DPR 670, 687 (1953).
[37] *OEG v. Martínez Giraud*, 210 DPR 79, 89 (2022); *Graciani Rodríguez v. Garage Isla Verde*, 202 DPR 117, 128 (2019); *González Segarra et al. v. CFSE*, 188 DPR 252, 277 (2013); *Pacheco v. Estancias*, 160 DPR 409, 431 (2003).
[38] *Gutiérrez Vázquez v. Hernández y otros*, 172 DPR 232, 244 (2007).
[39] *Otero v. Toyota*, supra, a la pág. 728.

Ahora bien, las conclusiones de derecho son revisables en todos sus aspectos.[40] Lo anterior fue reiterado por nuestro Tribunal Supremo cuando expresó que "al enfrentarse a un recurso de revisión judicial proveniente de una agencia administrativa será el deber de los tribunales revisar las conclusiones de derecho en todos sus aspectos."[41] En esta tarea, los tribunales están compelidos a considerar la especialización y la experiencia de la agencia con respecto a las leyes y reglamentos que administra.[42] Así pues, si el fundamento de derecho no conlleva interpretación dentro del marco de la especialidad de la agencia, entonces el mismo es revisable en toda su extensión.[43] Sin embargo, aun cuando el Tribunal tiene facultad para revisar en todos sus aspectos las conclusiones de derecho de una agencia, se ha establecido que ello no implica que los tribunales revisores tienen la libertad absoluta para descartarlas libremente.[44] Si del análisis realizado se desprende que la interpretación que hace una agencia de su reglamento o de la ley que viene llamada a poner en vigor resulta razonable, el Tribunal debe abstenerse de intervenir.[45]

### C. El Reglamento de Procedimientos Adjudicativos del DACo

El Reglamento de Procedimientos Adjudicativos del DACo (en adelante, Reglamento 8034),[46] provee un procedimiento uniforme para la adjudicación de querellas presentadas ante o por el Departamento para asegurar la solución justa, rápida y económica de las mismas.[47] Entiéndase que, las reglas contenidas en este Reglamento son de aplicación a las investigaciones y procesos administrativos sobre querellas iniciadas tanto por los

---

[40] *García Reyes v. Cruz Auto Corp.*, supra, a la pág. 894.
[41] *Vázquez y otro v. Consejo de Titulares y Junta de Directores del Condominio Los Corales y otros*, 2025 TSPR 56, 215 DPR ___ (2025).
[42] *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 DPR 70, 75-76 (2000).
[43] *Rivera v. A & C Development Corp.*, 144 DPR 450, 461 (1997).
[44] *Federation Des Ind. v. Ebel*, 172 DPR 615, 648 (2007); *López Borges v. Adm. Corrección*, 185 DPR 603, 626 (2012).
[45] *Cruz v. Administración*, 164 DPR 341, 357 (2005).
[46] Reglamento Núm. 8034 del 13 de junio de 2011.
[47] *Íd.*, Regla 1.

consumidores, así como por la propia agencia.[48] Un consumidor es "[t]oda persona natural, que adquiere o utiliza productos o servicios como destinatario final. Incluye a toda otra persona, asociación o entidad que por designación de ley está facultado para presentar su reclamación ante el departamento".[49] Por otra parte, el referido reglamento define al querellante como aquel "consumidor o representante autorizado que reclama un derecho o servicio en su capacidad personal. [. . .]".[50] De lo anterior, puede colegirse que, siempre y cuando el consumidor cumpla con las características antes señaladas, estará facultado para presenta una querella ante el DACo.

En lo pertinente al caso de marras, es preciso señalar que el Reglamento Núm. 8034 le concede a las partes involucradas en una querella la facultad de presentar prueba documental y testifical, incluyendo evidencia de carácter técnico y pericial.[51] Ahora bien, el reglamento deja claro que las Reglas de Procedimiento Civil y de Evidencia no son de estricta aplicación a las vistas administrativas.[52] Solo aplicarán aquellas reglas que el Funcionario o Panel de Jueces que presida la vista estime necesarias para llevar a cabo los fines de la justicia.[53]

**D. La Evaluación y Suficiencia de la Prueba.**

Sabido es que, aunque las Reglas de Evidencia no aplican en las vistas administrativas, sus principios fundamentales se utilizan como guías.[54] Respecto a la evaluación y suficiencia de la prueba, la Regla 110 de Evidencia establece que el juzgador de los hechos tiene el deber de "evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o

---

[48] Regla 3 del Reglamento Núm. 8034, *supra.*
[49] *Íd.*, Regla 4 (f).
[50] *Íd.*, Regla 4 (u).
[51] *Íd.*, Regla 20.5.
[52] *Íd.*, Regla 24.
[53] Regla 24 del Reglamento Núm. 8034, *supra.*
[54] Sección 3.13 (e) de la Ley Núm. 38, *supra*, 3 LPRA sec. 9653.

demostrados".[55] Asimismo, la aludida regla, establece que "[p]ara establecer un hecho, no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza".[56] Más bien, se requiere que la totalidad de la prueba haga más probable cierta conclusión.[57]

Cónsono con lo anterior, la evaluación de la prueba incluye la credibilidad y el valor probatorio que el juzgador le haya dado a la misma. En lo particular, "[l]a función del tribunal al analizar si la evidencia es susceptible de ser creída sólo requiere determinar si la evidencia puede ser creída por una persona razonable y de conciencia no prevenida, sin entrar a dirimir la credibilidad que amerita la prueba presentada".[58] Incluso, según la Regla 110 (d) de Evidencia, basta al juzgador de los hechos, la credibilidad a un solo testigo presentado, por una parte, para dar por acontecido tal hecho.[59] Sobre este particular, nuestro Tribunal Supremo de Puerto Rico estableció que "[l]a tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz".[60] Por lo tanto, en este contexto, los jueces son quienes están en mejor posición de aquilatar la prueba testifical desfilada, ya que tienen la oportunidad de apreciar de cerca las alocuciones de los testigos, mientras observan sus gestos, contradicciones, dudas, manerismos y titubeos.[61]

---

[55] 32 LPRA Ap. VI, R. 110.
[56] *Íd.*
[57] *Pereira Suarez v. Jta. Dir. Cond.*, 182 DPR 485, 529 (2011).
[58] *Pueblo v. Colón, Castillo,* 140 DPR 564, 582 (1996).
[59]  32 LPRA Ap. VI, R.110.
[60] *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 778-779 (2022), citando a *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013).
[61] *Pueblo v. Toro Martínez,* 200 DPR 834, 857-858 (2018); *Pueblo v. García Colón I,* 182 DPR 129, 165 (2011).

### III

En el recurso ante nuestra consideración, la parte recurrente nos solicita que revisemos una *Resolución*, emitida por DACo el 31 de julio de 2025, y notificada el 7 de agosto de 2025, mediante la cual declaró *Ha Lugar* la querella incoada por el recurrido y ordenó a la parte recurrente a pagarle la suma de $2,565.48 dólares al recurrido. En su pliego, la parte recurrente alzó cinco (5) errores, de los cuales algunos de ellos se encuentran estrechamente relacionados. Por tanto, el *primer* y *segundo* error se discutirán en conjunto, al igual que el *cuarto* y *quinto* error. Mientras que el *tercer* error se discutirá por separado.

Conforme relatamos previamente, el caso del título tuvo sus inicios cuando el aquí recurrido presentó una *Querella* ante el DACo en contra de la parte recurrente. A través de esta *Querella*, alegó, en suma, que llevó su vehículo de motor al taller de mecánica de la parte recurrente para remediar unos problemas que tenía con la transmisión y, estando allí, el referido auto dejo de prender por, presuntamente, no haberse encendido por mucho tiempo. Conviene mencionar que, posteriormente, esta *Querella* fue enmendada para, entre otras cosas, añadir que, mientras el vehículo se encontraba en el taller de la parte recurrente, la batería fue removida y la misma encontraba fuera de lugar.

Posteriormente, la parte recurrente presentó su contestación a la querella original y negó las alegaciones allí presentadas. Así, pues, el DACo señaló una fecha para inspeccionar el vehículo. Mediante la referida inspección, se encontró que el vehículo, en efecto, era incapaz de iniciar la marcha, por lo que el inspector recomendó que se le realizara un diagnóstico general con un electromecánico.

De ahí, surge del expediente administrativo, que se celebró una *primera* vista administrativa en la cual se le ordenó a las partes

del título a ponerse de acuerdo para consultar con un perito electromecánico para que este rindiese un informe para la agencia, el cual sería costeado por ambas partes.

Pasado un tiempo, el recurrido le remitió un comunicado al DACo a través del cual le indicó que se había llevado el vehículo objeto de este caso a un taller con el nombre de Toyota Specialist para que, según ordenado, se realizara una evaluación y estimado de reparación. Sin embargo, conforme alegó en esta comunicación, dado a la dilación del referido taller en cumplir con lo solicitado, el recurrido se llevó el vehículo del mismo y se encontraba en comunicación con el taller Electro Cool, el cual estaba en posición de recibir el vehículo en los próximos días.

Luego, se celebró una *segunda* vista administrativa en la cual el recurrido le informó al DACo respecto a lo expresado en el correo electrónico. Puntualizamos que no surge de los autos que, en ese momento, se hubiese presentado reparo alguno a lo manifestado por el recurrido.

Tras varios trámites procesales, impertinentes para las controversias ante nuestra consideración, se celebró una *tercera* y última administrativa. Según adelantamos, la única prueba directa exhibida duranta la vista fue aquella presentada por el recurrido. La parte aquí recurrente no presentó ningún tipo de prueba en su defensa. De manera que la prueba consistió en el testimonio del propio recurrido y el testimonio de la parte recurrente, como testigo hostil. Igualmente, fueron admitidos siete (7) documentos en evidencia y el recurrido ofreció como prueba el Anejo D-1 de la *Querella Enmendada.*

Celebrada la vista, la parte recurrente presentó una *Moción de Non-Suit al amparo de la Regla 39.2,* en la cual esbozó esencialmente los mismos argumentos que trajo ante la consideración de esta

Curia. En reacción, el recurrido instó una oposición a la referida moción, en la cual peticionó que se declarara sin lugar.

Evaluado todo lo anterior, el DACo emitió la *Resolución* que nos ocupa. En esta, declaró *Ha Lugar* la querella incoada por el recurrido, así como que ordenó a la parte recurrente a pagarle a este la suma de $2,565.48 dólares. Inconforme, y ante la negativa del DACo de atender su solicitud de reconsideración, la parte recurrente acudió ante este Tribunal de Apelaciones mediante el presente recurso.

Establecido lo anterior, puntualizamos que, en esencia, la parte recurrente plantea en sus primeros dos (2) señalamientos de error, que el recurrido carece de legitimación para pedir un remedio ante el DACo, toda vez que solo pagó un adelanto de $1,500.00 dólares y no pagó el balance de reparación de $1,300.00 dólares. Por lo anterior, aduce que el querellante, no es consumidor dado a que incumplió con su parte de la contratación de servicios. Asimismo, señaló que la cuantía que se ordenó devolver al recurrido era improcedente, ya que dicha suma es contraria a la prueba presentada durante la audiencia administrativa y la habida en el expediente. Arguyó que el recurrido solo tiene meras alegaciones infundadas y sin prueba de que el motor se haya dañado por alguna actuación u omisión negligente de su parte.

Respecto al argumento de la parte recurrente, en cuanto a que el recurrido no era un consumidor y no tenía legitimación para presentar la querella del título, puesto a que incumplió con su parte de la contratación de servicios, reiteramos lo expuesto en nuestra exposición doctrinal previa. Conforme dispone el Reglamento de Procedimientos Adjudicativos del DACo, quien tiene facultad para presentar una querella ante esta agencia, es el consumidor que

adquiere o utiliza productos o servicios como destinatario final.[62] En consideración a lo anterior, somos de la opinión que nuestro ordenamiento no le exige al consumidor haber cumplido con las contraprestaciones de un contrato para ostentar legitimación para presentar una reclamación ante el DACo.

De otra parte, precisa destacar que la agencia recurrida tenía presente que el recurrido tenía un balance pendiente de pagar el cual correspondía al trabajo de reparación de la transmisión realizado por la parte recurrente. De modo que, al desglose de daños económicos sufridos por el recurrido, se le descontó la suma de $1,300 dólares, cantidad que correspondía al referido balance pendiente. [63]

Por otro lado, en cuanto a la alegación del recurrente de que la cuantía que se ordenó devolver al recurrido era improcedente, dado a que la suma era contraria a la prueba presentada, precisa apuntalar que, según el estándar establecido en nuestro ordenamiento jurídico vigente, en vista de que son las agencias las que producen y determinan los hechos en los procesos administrativos, de ordinario, debe respetarse la apreciación de la agencia, incluso cuando exista un conflicto razonable en la prueba.[64] Así, pues, quien alegue ausencia de evidencia sustancial deberá presentar prueba suficiente para derrotar que lo determinado por la agencia es correcto.[65] En otras palabras, deberá demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración.[66]

---

[62] Véase Regla 4 (f) y (u) del Reglamento 8034, *supra*.
[63] SUMAC TA, a la Entrada Núm. 1, Apéndice 2.
[64] *Hilton v. Junta de Salario Mínimo*, supra, a la pág. 687.
[65] *OEG v. Martínez Giraud*, supra, a la pág. 89.
[66] *Gutiérrez Vázquez v. Hernández y otros*, supra, a la 244.

Pese a que la parte recurrente alega que la suma de la cuantía que se ordenó a devolverle al recurrente es improcedente, fue incapaz de demostrarle a este tribunal que existe otra prueba que reduzca el valor de la evidencia que alega que fue aquilata erróneamente, por lo que sus argumentos se basan en meras alegaciones. Por consiguiente, nos vemos impedidos de sustituir el criterio de la agencia por el nuestro.

Por otra parte, en su *tercer* señalamiento de error, la parte recurrente sostiene que hubo expoliación de la prueba debido a que el recurrido incumplió con una orden del juez administrativo, al retirar el vehículo del mecánico al cual ambas partes habían previamente acordado y al llevarlo al taller Electro Cool, sin informar.

En cuanto a este error, reseñamos, de entrada, que las Reglas de Evidencia no son de estricta aplicación a las vistas administrativas.[67] Por consiguiente, únicamente aplicarán aquellas reglas que el funcionario que presida la vista estime necesarias para llevar a cabo los fines de la justicia.[68] Dicho lo anterior, es menester destacar que la expoliación de evidencia es una doctrina que proviene del ámbito federal la cual se refiere, entre otras cosas, a los actos de destruir o esconder evidencia.[69] Cierto es el hecho que el recurrido ignoró una orden del tribunal la cual le requería ponerse de acuerdo con la parte recurrente para identificar un electromecánico que rindiera un informe del vehículo. Conforme se desprende del expediente administrativo, el recurrido unilateralmente removió su vehículo del taller acordado por las partes y lo llevó a otro taller seleccionado por él, debido a la presunta tardanza del primer taller en realizar la evaluación solicitada. Ahora

---

[67] Regla 24 del Reglamento Núm. 8034, *supra.*
[68] *Íd.*
[69] Véase, Neptune Rivera, *Los retos de la evidencia electrónica*, 76 Rev. Jur. UPR 337, a la pág. 342 (2007).

bien, ni del expediente ni de la grabación de la vista del 9 de abril de 2025, surge que el recurrente violó la orden del DACo a los fines de esconder o destruir evidencia. Por otra parte, conviene mencionar que el recurrido informó al DACo, mediante correo electrónico y durante la vista del 30 de octubre de 2024, que removió su vehículo del taller acordado por las partes y lo llevó a otro taller con el nombre de Electro Cool, empero, no se expresó reparo a las acciones del recurrente hasta la vista del 9 de abril de 2025, cuando la parte recurrente expresó, por primera vez, que la acciones del recurrido constituían expoliación de evidencia.

De otra parte, en su *cuarto* señalamiento de error, la parte plantea que el recurrido incumplió con presentar prueba sustancial que estableciera negligencia alguna de que se le causó daños al motor. Esto, puesto a que la prueba del recurrido constó únicamente de su testimonio y el de la parte recurrente como testigo hostil, de manera que no presentó prueba alguna de naturaleza pericial que confirmara las alegaciones de la querella. Arguyó que, siendo su querella una petición de daños, correspondía que el recurrido estableciera los elementos de causalidad. Finalmente, en su *quinto* señalamiento de error, indicó que las determinaciones de hechos emitidas por el DACo eran contrarias a la prueba desfilada.

En mérito de lo planteado por la parte recurrente precisa resaltar que, en nuestro esquema probatorio, basta con la credibilidad de un solo testigo para dar acontecido un hecho.[70] Ello, puesto a que para establecer un hecho no se requiere un grado de prueba que produzca absoluta certeza.[71] Únicamente, se exige que la totalidad de la prueba haga más probable cierta conclusión.[72] Por consiguiente, no es posible concluir que, en el presente caso, la

---

[70] Regla 110 (d) de Evidencia, *supra.*
[71] Regla 110 de Evidencia, *supra.*
[72] *Pereira Suarez v. Jta. Dir. Cond.*, supra, a la pág. 529.

prueba presentada por el recurrido fue insuficiente por el mero hecho de que solo presentó su propio testimonio y el de la parte recurrente, como testigo hostil. Tampoco es posible colegir que era necesario presentar prueba pericial para probar la negligencia de la parte recurrida. Menos aún, nos es posible concluir que se falló en demostrar negligencia de parte del aquí recurrente. Tras evaluar minuciosamente el expediente administrativo y escuchar la grabación de la vista del 9 de abril de 2025, coincidimos con el DACo respecto a que, según la prueba admitida, la negligencia de la parte recurrente consistió en que el vehículo objeto de este caso se le fue entregado en condiciones funcionales, fue examinado, diagnosticado y operado por la propia parte recurrente, antes de realizar la reparación de la transmisión, pero no volvió a encender inmediatamente después de su intervención.[73]

De otro lado, es menester señalar que, según adelantamos, quien alegue ausencia de prueba sustancial, debe demostrar que existe otra prueba en el expediente que nos convide a concluir que lo determinado por la prueba fue irrazonable dado a la prueba que tuvo a su consideración,[74] cosa que en este caso no ocurrió. Por último, es de ver que, pese a que el recurrente expresó que las determinaciones de hecho esgrimidas por el DACo fueron contrarias a la prueba desfilada, no identificó a cuáles determinaciones se refería, ni tampoco hizo referencia a la prueba que era contraria a las mismas, de modo que no estamos en posición de disponer sobre este señalamiento de error.

Por todo lo antes expuesto, nos es forzoso concluir que los cinco (5) errores esgrimidos por la parte recurrente *no se cometieron.* En consideración a lo anterior, procede confirmar el dictamen recurrido.

---

[73] SUMAC TA, a la Entrada Núm. 1, Apéndice 2.
[74] *Gutiérrez Vázquez v. Hernández y otros*, supra, a la 244.

IV

Por los fundamentos que anteceden, se *confirma Resolución* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones